UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


GREAT AMERICAN INSURANCE COMPANY,

       Plaintiff,

                                        Case Number 09-12488-BC

v.                                    Honorable Thomas L. Ludington

GEOSTAR CORPORATION , TONY P.
FERGUSON, THOM E. ROBINSON, JOHN
W. PARROTT, S. DAVID PLUMMER,
SPENCER D. PLUMMER, CLASSICSTAR
FARMS, INC., CLASSICSTAR FARMS,
LLC, FIRST SOURCE WYOMING, INC.,
GEOSTAR EQUINE ENERGY, INC.,
GEOSTAR FINANCIAL CORPORATION,
GEOSTAR FINANCIAL SERVICES
CORPORATION, AND DOES 1–100,

       Defendants,

and

AXIS REINSURANCE COMPANY,

       Plaintiff,

                                        Case Number 09-12608-BC

v.                                    Honorable Thomas L. Ludington

GEOSTAR CORPORATION , TONY P.
FERGUSON, THOM E. ROBINSON, JOHN
W. PARROTT, S. DAVID PLUMMER,
SPENCER D. PLUMMER, CLASSICSTAR
FARMS, INC., CLASSICSTAR FARMS,
LLC, FIRST SOURCE WYOMING, INC.,
GEOSTAR EQUINE ENERGY, INC.,
GEOSTAR FINANCIAL CORPORATION,
GEOSTAR FINANCIAL SERVICES
CORPORATION, AND DOES 1–100,

       Defendants,

and

GEOSTAR CORPORATION, TONY P.
FERGUSON, THOM E. ROBINSON, JOHN
W. PARROTT, CLASSICSTAR FARMS, INC.,
FIRST SOURCE WYOMING, INC., GEOSTAR
FINANCIAL CORPORATION, AND GEOSTAR
FINANCIAL SERVICES CORPORATION,

       Plaintiffs,

                                          Case Number 09-14306-BC
v.                                  Honorable Thomas L. Ludington

AXIS REINSURANCE COMPANY,

       Defendant,

v.

S. DAVID PLUMMER AND SPENCER D.
PLUMMER,

       Movants.

_____/

## ORDER RESOLVING MOTIONS TO DISMISS, FOR SUMMARY JUDGMENT, FOR DECLARATORY RELIEF, AND TO TAKE JUDICIAL NOTICE

Plaintiffs Axis Reinsurance Company and Great American Insurance Company each contend that directors and officers ("D&O") insurance policies they issued in 2004 do not cover claims related to a "mare-lease program" and related investments administered by Defendants GeoStar Corporation, Tony P. Ferguson, Thom E. Robinson, John W. Parrott, S. David Plummer, Spencer D. Plummer, ClassicStar Farms, Inc., First Source Wyoming, Inc., GeoStar Equine Energy, Inc., GeoStar Financial Corporation, GeoStar Financial Services Corporation, and other unnamed persons or entities (collectively "GeoStar" or "Defendants"). The primary D&O policy consisted of $5 million in coverage provided by Travelers Casualty and Surety Company of America ("Travelers"),

the $5 million Axis Policy provided a second tier of excess coverage, and the $10 million Great American Policy provided a third tier of excess coverage. In July of 2009, the $5 million Travelers policy was exhausted by defense costs associated with defending claims arising from the mare-lease program litigation. Axis and Great American then filed suit seeking declarations that their policies do not cover those claims. The first case, *Axis Reinsurance Co. v. GeoStar*, includes two consolidated cases—one originally filed in this district by Axis on July 2, 2009 (Case No. 09-12608), and the other originally filed in the Eastern District of Kentucky by GeoStar on November 2, 2009 (Case No. 09-14306). The second case, *Great American Insurance Co. v. GeoStar*, was originally filed in this Court by Great American on June 24, 2009 (Case No. 09-12488).

The current motions raise questions concerning the pleading standard for rescission of insurance contracts under Michigan law; whether exclusions in the Great American and Axis policies for errors or omissions in rendering or failing to render professional services apply; whether and to what extent this Court may take judicial notice of guilty pleas entered by certain defendants in another jurisdiction; and whether GeoStar is entitled to a declaratory judgment, requiring Axis to advance litigation costs pending resolution of this case.

**I**

The facts underlying these cases are not particularly well developed, considering that GeoStar has already exhausted a $5 million insurance policy defending the company, its subsidiaries, and its principals in lawsuits arising out of the mare-lease litigation. Moreover, because GeoStar has not answered the complaints in either of the cases filed by the insurance companies, it is sometimes difficult to determine the facts that are in dispute and the facts that are not. What follows is a brief outline of the pertinent facts as they can be understood from the

pleadings and papers filed with the Court.

GeoStar is a privately held company based at the time the mare-lease program was ongoing in Mt. Pleasant, Michigan. It was incorporated in 1996 and had more than 100 shareholders and 125 employees in 2004 when the insurance policies were issued. Defendant Robinson was GeoStar's president, CEO, and principal shareholder. He was also a director. Defendants Ferguson and Parrott were also officers and directors of GeoStar. Together, the three principals owned the majority of GeoStar shares. GeoStar organized ClassicStar in about 2001, as a Kentucky-based limited liability company, to operate a newly-acquired or newly-developed mare-lease business. Defendants David and Spencer Plummer managed ClassicStar, and as such, were potentially covered by the D&O policies.

Before acquiring ClassicStar, GeoStar was primarily involved in the energy business. Through a subsidiary called Gastar, GeoStar owned many undeveloped oil and gas properties in the western United States and Canada. Although Gastar was traded on the American Stock Exchange,[1] the majority of Gastar's shares were held by GeoStar. GeoStar, through Gastar, owned the undeveloped properties and mineral rights, but it did not have the liquidity it needed to develop the properties. In 2000, the GeoStar principals became acquainted with the Plummers, who allegedly suggested the mare-lease program as a vehicle to raise cash to advance the energy business.

With the Plummers assistance, GeoStar organized ClassicStar and began leasing mares to investors. Through the program, investors leased thoroughbred mares for one year, breeding the mare and taking ownership of any living foal that resulted. The purported tax advantages associated with the business made it popular with investors, raising as much as $600 million. Lease expenses,

---

[1]Now called NYSE Amex Equities.

-4-

including the lease fee paid to the mare owner, the breeding fee to the stallion owner, insurance costs, and boarding costs, were deductible from ordinary income in the year they were accrued, even though net income would not be realized until the foal was sold, often four or five years after the majority of expenditures had been paid. Moreover, income from the sale of the foals was characterized as a capital gain and taxed at a lower rate than ordinary income.

Substantial problems with the mare lease program soon developed. First, GeoStar had fewer mares than the program interests it sold. To remedy the problem, GeoStar attempted to persuade investors to trade their mare-lease interests for energy interests or interests in other properties. Second, much of the cash-flow from the mare-lease business was apparently diverted from the equine program to the energy business, compounding problems caused by the oversold mare-lease program. Third, in approximately 2003, the IRS began to audit mare-lease clients, disallowing the tax deductions the program was intended to afford. As of this date, the program has spawned criminal charges against the Plummers in the District of Oregon, and at least thirty civil suits filed by program clients against GeoStar, its subsidiaries, and its officers, directors and employees. Many of the civil suits have been consolidated in the Eastern District of Kentucky in MDL 1877. *See In re ClassicStar Mare Lease Litigation*, MDL 1877, No. 5:07-cv-353 (E.D. Ky.).

The Travelers, Axis, and Great American D&O policies were issued in September 2004.[2] The timing and degree to which the mare-lease program was oversold, and the extent to which GeoStar and its principals knew about the problem remain contested matters. All three policies were "wasting" policies, meaning payments from the policy, whether for defense costs, judgments, or

_____

[2]The policies were renewed for an additional year in 2005, and by endorsement for another year in 2006. Apparently, all the contested claims, if they are covered, would be covered by the 2004 policy.

settlements, are deducted from the policy limits and reduce the amount available to pay future expenses. Travelers covered all costs associated with defending the disputed mare-lease claims involved in this case. Travelers informed GeoStar on June 16, 2009 that only $96,762.64 remained available under the policy. On June 24, 2009 and July 2, 2009, respectively, Great American and Axis filed the instant cases. On July 9, 2009 Travelers informed GeoStar, Axis, and Great American that its policy was exhausted. Counsel for GeoStar represented to the Court at oral argument that the entire $5 million policy was exhausted defending the mare-lease claims, no settlements or judgments were paid from the Travelers policy.

The parties agree that the Axis and Great American policies "follow form" to the Travelers Policy, meaning Axis and Great American provided insurance to GeoStar pursuant to the terms of the Travelers Policy. Axis and Great American did, however, require their own application forms and modified certain provisions of the Travelers Policy. Axis and Great American contend that the seventeen mare-lease claims[3] at issue in these cases are not covered by the excess D&O policies.

---

[3]The mare-lease matters at issue in this case are *West Hill Farms v. ClassicStar, LLC*, No. 06-243-JMH (E.D. Ky. Feb. 2, 2009); *Ginaldi v. ClassicStar, LLC*, No. 5:08-cv-00109-JMH (E.D. Ky. Apr. 18, 2008); *Premiere Thoroughbreds, LLC v. ClassicStar, LLC*, No. 5:07-cv-348 (E.D. Ky. Nov. 16, 2009); *Raifman v. ClassicStar, LLC*, No. 3:07-cv-2552-MJJ (N.D. Cal. Feb. 2, 2009); *Baker v. Plummer*, No. 08-cv-1215 (D. Colo. June 6, 2008); *Lyon v. Ferguson*, No. 5:09-215-JMH (E.D. Ky. Aug. 7, 2009); *United States v. S. David Plummer*, No. CR-09-391-1 (HA) (D. Or. Oct. 26, 2009); *United States v. Spencer D. Plummer*, No. CR-09-391-2 (HA) (D. Or. Oct. 26, 2009); *J&L Canterbury Farms, LLC v. ClassicStar, LLC*, No. 5:07-cv-349-JMH (E.D. Ky. Dec. 27, 2007); *Goyak v. ClassicStar Racing Stable, LLC*, No. 1:07-cv-15260 (E.D. Mich. Dec. 10, 2007); *Bissmeyer Properties, LP v. ClassicStar, LLC*, No. 5:07-cv-351-JMH (E.D. Ky. Dec. 21, 2007); *Spongberg v. GeoStar Corp.*, No. VC046736 (Super. Ct. Cal. May 22, 2007); *Skinner v. ClassicStar, LLC*, No. 5:07-cv-419-JMH (E.D. Ky. May 30, 2008); *Hamrick v. Ferguson*, No. A581409 (Dist. Ct. Nev. Jan. 30, 2009); *Tillotson v. Plummer*, No. 080412334 (3d Dist. Ct. Utah July 15, 2008); *Stanwyck Glenn Farms, LLC v. Wilmington Trust of Pennsylvania*, No. 1:08-CV-05866-RMB-AMD (D.N.J. Dec. 1, 2008); *Fortenbaugh v. ClassicStar Financial Services, Inc.*, No. 5:07-cv-00353-JMH (E.D. Ky. Jan. 30, 2009). There are also two matters that were apparently settled. GeoStar contends that settlements in those matter may also be covered by the excess D&O policies.

**II**

GeoStar filed a similar motion to dismiss in both the Axis and Great American cases, contending the first two counts of both complaints should be dismissed under Federal Rule of Civil Procedure 12(b)(6).  The counts at issue allege that the Axis and Great American policies are void under Michigan law because GeoStar and its principals misrepresented certain information in the applications for insurance coverage.  The motions to dismiss contend that these counts should be dismissed because Axis and Great American have not alleged that a GeoStar executive or an insured officer or director *knew* about the alleged misrepresentations.

**A**

Michigan law[4] provides that a material misrepresentation in an application for insurance entitles the insurer to rescind the policy, even if an individual insured did not know of the material misrepresentation.  *Am. Guar. & Liab. Ins. Co. v. Jaques Admiralty Law Firm*, 121 Fed. App'x 573, 575–76 (6th Cir. 2005); *see also Lake States Ins. Co. v. Wilson*, 231 Mich. App. 327, 331 (1998) ("It is the well-settled law of this state that where an insured makes a material misrepresentation in the application for insurance, . . . the insurer is entitled to rescind the policy and declare it void ab initio."); *Lash v. Allstate Ins. Co.*, 210 Mich. App. 98, 103 (1995) ("Rescission is justified in cases of innocent misrepresentation if a party relies upon the misstatement.").

In *Jaques Admiralty Law Firm*, for example, the president and majority shareholder of a Michigan-based law firm with eleven attorneys misappropriated more than $15 million in settlement funds from clients over the course of ten years.  *Id.* at 574.  During the time that the fraud was

---

[4]All parties agree that Michigan law applies to the interpretation of the insurance policies. The policies were underwritten in Michigan for the protection of a Michigan company.

occurring, the firm applied for professional liability insurance from American Guarantee & Liability Insurance Company, answering "no" to questions concerning whether "any lawyer" at the firm knew of circumstances which could give rise to a claim against an attorney or the firm for professional liability. *Id.* The fraud was perpetrated solely by the president of the firm, and was not discovered until after his death. At the time the application for insurance was submitted, no other attorney at the firm, including the vice president who submitted the application, knew of the fraud. Nevertheless, the court held that the policy could be rescinded solely because of the firm president's misconduct. *Id.* at 575–76.

Parties are free, however, to alter the default rule furnished by Michigan law. *Id.* at 576; *see also Wedtech Corp. v. Fed. Ins. Co.*, 740 F. Supp. 214, 218–19 (S.D.N.Y. 1990); *Shapiro v. Am. Home Assurance Co.*, 616 F. Supp. 900, 903–05 (D. Mass. 1984). Indeed, that is precisely what GeoStar contends the parties did in this instance. According to GeoStar, a severability provision in the underlying Travelers policy and a similar provision in the Great American policy clarify that a misrepresentation in the application will render the policy void, but only with respect to certain insureds.

In lieu of an answer, GeoStar moved to dismiss the rescission counts of the Axis and Great American complaints for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In most circumstances, a pleading will survive a Rule 12(b)(6) motion if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). GeoStar emphasizes that when pleading fraud, however, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations,

a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "Factual allegations must be enough to raise a right to relief above a speculative level, on the assumption that all the allegations in the complaint are true . . . ." *Id.* at 555–56 (citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). "Facial plausibility" requires the plaintiff to include sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

If the complaints plead fraud claims, even more particularized facts are required. *Cf.* Fed R. Civ. P. 8(a) & 9(b). The allegations at issue in the first two counts—that GeoStar included material misrepresentations on its insurance applications—are not necessarily allegations of fraud because there is no "intent" element. *See Hanover Exch. v. Metro Equity Group LLC*, No. 2:08-cv-14897, 2009 WL 2143866 (E.D. Mich. July 14, 2009) (noting that Rule 9(b) applies to fraud claims, but Rule 8(a) applies to negligent misrepresentation claims); *see also Black's Law Dictionary* 670 (7th ed. 1999) ("A knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment."). If, however, the insurance companies are required to plead intentional misstatements to prove rescission, Rule 9 would apply.

Ultimately, the determination of whether Rule 8 or 9 applies to the complaints has little effect on the Court's analysis because "the degree of detail required to satisfy [Rule 9(b)] often turns on the substantive context in which the fraud is alleged to have occurred . . . ." 5A Charles Alan

Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298 (3d ed. 2004 & Supp. 2009). The pleading requirements, as discussed below, turn on the requirements of the insurance contracts themselves. The insurers are required to plead sufficient facts to demonstrate that they are entitled to rescind the insurance contracts pursuant to the terms of the applicable severability clauses.

Moreover, "Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony." *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 679 (6th Cir. 1988). The overriding purpose of Rule 9(b) "is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *Id.* Consequently, to comply with rule 9(b), the complaint must allege "the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex LP*, 2 F.3d 157, 161–62 (6th Cir. 1993) (citations and internal quotations omitted). The only element potentially missing from the plaintiffs' complaints in these cases, is an allegation that the alleged fraud was intentional, i.e., that the alleged misrepresentation was knowingly made. In both the Great American and Axis cases, the plaintiff insurance companies will have an opportunity to amend their complaints to allege that the misrepresentations were knowingly made, and to include sufficient factual background to provide GeoStar with fair notice of the claims.

**B**

In the Axis case (09-12608), the key "severability" provision is found in the underlying Travelers Policy at section III.P. on page thirteen. The provision, labeled "Representations," provides in pertinent part:

> By acceptance of this Policy, each Insured represents that the statements contained
> in The Wrap Application, any Coverage Part Application, or any other application

completed for the proposed Policy, all of which are deemed to be attached to, incorporated into, and form a part of, this policy, are said Insured's agreements and representations, that such representations are material to the Company's acceptance of this risk, that this policy is issued in reliance upon the truth of such representations, and that this policy embodies all agreements existing between said Insured and the Company or any of its agents relating to this insurance.

In the event that any statement or representation in The Wrap Application or Liability Coverage Part Application is untrue, the Policy or such Liability Coverage Part(s), respectively shall be void and of no effect whatsoever, but only with respect to:

1. any Insured Person who knew, as of the Policy Inception Date, that the statement or representation was untrue;

2. the Insured Organization, to the extent it indemnifies any such Insured Person, under any Liability Coverage Part; and

3. the Insured Organization, under any Liability Coverage Part, if any Executive Officer knew, as of the Policy Inception Date, that the statement or representation was untrue.

Whether an Insured Person or Executive Officer had such knowledge shall be determined without regard to whether the Insured Person or Executive Officer actually knew The Wrap Application or applicable Coverage Part Application contained such untrue statement or representation.

Travelers Policy, No. 104192135 at 13.

The severability provision in the underlying Travelers Policy applies equally to the Axis Policy because it is an excess insurance policy that "follows form" to the primary policy. Indeed, by its own terms, "[e]xcept as specifically set forth in the provisions of the [Axis Policy], the insurance afforded [under the Axis Policy] shall apply in conformance with the provisions of the applicable Primary Policy . . . ." Axis Policy I. at 6. The Axis Policy does not contain a separate severability clause, nor does it specifically disclaim the applicability of the severability clause in the underlying Travelers Policy. Consequently, the severability clause applies to the Axis Policy.

Axis contends that the severability clause in the Travelers Policy cannot apply to the Axis

Policy because the severability provision is limited to misrepresentations in "The Wrap Application or Liability Coverage Part Application." Travelers Policy III.P. at 17. "The Wrap" is a proper name—indeed it is a registered trademark belonging to Travelers—used by the company to refer to a specific insurance product offered to privately held companies. "The Wrap Application," therefore, refers to the specific application that Travelers used to evaluate applicants for the insurance product that GeoStar ultimately purchased. Neither policy indicates that the references to "The Wrap Application" in the Travelers Policy were intended to refer specifically to the application for the primary policy, to the exclusion of the other policy applications. "Except as specifically set forth" in the Axis Policy, the terms of the Travelers Policy apply equally to the Axis Policy. Axis's reading of the Travelers Policy demands too much of the severability provision's specific reference to "The Wrap Application." The reference to "The Wrap Application" in the severability provision should be read generally as "the application for insurance." *See also In re Healthsouth Corp. Ins. Litig.*, 308 F. Supp. 2d 1253, 1259, 1288–89 (N.D. Ala. 2004) (applying a severability clause in a primary policy which referred to "the Application" to an excess policy).

However, Axis's contentions with regard to the applicability of the severability provision are not without merit and dismissing the Counts I and II in their entirety would be unreasonably harsh as well as unnecessary. Axis requested, in the alternative, an opportunity to amend its complaint to allege that individual insureds knew of the misrepresentations at the time the policy took effect. The request is reasonable, particularly in light of the fact that GeoStar has not yet answered the Axis complaint. GeoStar would not be unreasonably prejudiced by providing Axis with an opportunity to amend its complaint.

Although the prudent course for Axis would have been to seek leave to amend its complaint

immediately upon review of the GeoStar motion to dismiss, which was filed several months ago, both the Federal Rules of Civil Procedure and Sixth Circuit precedent suggest leave to amend a complaint should be "freely give[n]" in these circumstances.  Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend pleadings] when justice so requires."); *see also United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003) (noting that "where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend" before the case is dismissed with prejudice) (citations and internal quotations omitted).

## C

Moving to the motion to dismiss in the Great American case (09-12488), there is a specific severability provision in the Great American Policy which provides:

> The undersigned Officer of the Company declares that to the best of his or her knowledge the statements set forth herein are true and correct and that reasonable efforts have been made to obtain sufficient information from each and every Director and Officer proposed for this insurance to facilitate the proper and accurate completion of this Proposal Form.  The undersigned further agrees that if any significant adverse change in condition of the applicant is discovered between the date of this Proposal Form and the effective date of the Policy, which would render this Proposal Form inaccurate or incomplete, notice of such change will be reported in writing to the Insurer immediately.  The signing of this Proposal Form does not bind the undersigned to purchase the insurance.

> It is agreed by the Company and the Insured Persons that the particulars and statements contained in this proposal form and any information provided herewith (which shall be on file with the Insurer and be deemed attached hereto as if physically attached hereto) are the basis of this Policy and are to be considered as incorporated in and constituting a part of this Policy.  It is further understood and agreed by the Company and the Directors and Officers that the statements in this Proposal Form or any information provided herewith are their representations, that they are material and that this Policy is issued in reliance upon the truth of such representations; provided, however, that except for material facts or circumstances known to the person who subscribed this Proposal Form, any misstatement or omission in the Proposal Form or information provided herewith in respect of a Wrongful Act by a particular Director or Officer or his or her cognizance of any matter which he or she has reason to believe might afford grounds for a future Claim

against him or her shall not be imputed to any other Director or Officer for purposes of determining the validity of this Policy as to such other Director of Officer.

Great American Policy No. DFX0009868 at 17.

The Great American severability provision similarly alters the presumption under Michigan law that any material misrepresentation on the application for insurance voids the policy as to all insureds, whether they knew of the misrepresentation or not.[5]  But the Great American severability provision is more limited than the Travelers provision.  Pursuant to the Great American severability provision, if Thom Robinson—the president of GeoStar and the signatory to the Great American insurance application—knew that there were material misrepresentations on the Great American application it is void as to all insureds.  Moreover, the severability provision provides no protection for the company; the policy is void as to GeoStar, ClassicStar, and other subsidiaries if Axis can demonstrate that there was a material misrepresentation on the application for insurance.  However, if some individual directors and officers other than Thom Robinson knew of certain types of misrepresentations and others did not, the insurance policy is void only as to those individual directors and officers who knew of the relevant misrepresentations at the time the policy took effect. The provision, however, is ambiguous as to precisely which representations may be imputed to innocent officers and directors and which may not.

The severability provision provides, in pertinent part, that "any misstatement or omission in the Proposal Form or information provided herewith in respect of a Wrongful Act by a particular Director or Officer or his or her cognizance of any mater which he or she has reason to believe might afford grounds for a future Claim against him or her shall not be imputed to any other Director or

---

[5]Neither party contends that the severability provision in the underlying Travelers Policy applies to the Great American Policy.

-14-

Officer . . . ." Great American Policy at 17. The severability provision is ambiguous because it is not clear whether the phrase "in respect of a Wrongful Act by a particular Director or Officer" modifies only the phrase "information provided herewith" or both that phrase and the phrase "misstatement or omission in the Proposal Form." Nor is it clear whether the phrase "his or her cognizance of any matter which he or she has reason to believe might afford grounds for a future Claim against him or her" is intended to modify an earlier phrase or stand alone.

In the face of ambiguity, Michigan law requires the Court to construe the policy in favor of the insureds. *Henderson v. State Farm Fire & Cas. Co.*, 460 Mich. 348, 354 (1999). But this rule "does not mean that the plain meaning of a word or phrase should be perverted, or that a word or phrase, the meaning of which is specific and well recognized, should be given some alien construction merely for the purpose of benefitting an insured." *Id.* Accordingly, the ambiguity will be construed in favor of the insureds. The "misstatements" phrase, the "information provided" phrase, and the "cognizance" phrase will be interpreted as separate provisions, each standing apart from the others. Consequently, (1) "misstatement[s] or omission[s] in the Proposal Form . . . shall not be imputed to any other Director or Officer"; (2) "information provided herewith in respect of a Wrongful Act by a particular Director or Officer . . . shall not be imputed to any other Director or Officer"; and (3) a Director or Officer's "cognizance of any matter which he or she has reason to believe might afford ground for a future Claim against him or her shall not be imputed to any other Director of Officer." This interpretation of the provision gives meaning to each separate phrase, whereas Great American's proposed interpretation—that the words "in respect of a Wrongful Act" modifies both earlier phrases—renders the "misstatements" and "information provided" phrases duplicative.

It is worth emphasizing that this interpretation of the clause should be characterized as limited. The provision clearly and unambiguously provides that any misstatement or omission that was known to Robinson at the time the policy took effect will be imputed to every other officer, director, and entity, whether they knew of the misrepresentation or not. It is also clear that the provision provides no protection for the covered entities, only covered officers and directors. Any misstatement or omission known to any covered officer or director will be imputed to the covered entities for the purposes of determining coverage. The clear import of the provision is that it protects innocent officers and directors from the harsh effect of rescission, but it does nothing more.

Notwithstanding the Court's interpretation of the provision to benefit the insured, GeoStar's motion to dismiss Counts I and II of the Great American complaint will be denied because Great American alleged in its complaint that the person who "subscribed" the policy proposal, GeoStar president Thom E. Robinson, knew at the time the policy took effect that at least one of the representations on the application for insurance was false. Great American alleged that Robinson, the GeoStar president, answered "No" to a question concerning whether he or any other officer or director was "aware" of any fact that might give rise to a claim against the company, its subsidiaries, or its officers and directors. Pursuant to the severability provision, "material facts and omissions known to the person who subscribed the Proposal Form" are imputable to every other insured.

Although the motion will be denied, Great American will still be provided with an opportunity to amend its complaint in accordance with the interpretation of the severability clause set forth in this opinion and order. Leave to amend is appropriate, as discussed in subsection III B, because the severability clause is ambiguous and GeoStar will not be prejudiced because it has not

yet answered the complaint.

## III

Both Great American and Axis have filed motions for summary judgment as to the counts of their respective complaints that seek a declaratory judgment that expenses arising from the mare-lease litigation are not covered by their policies. Axis Cmpl. Count III; Great American Cmpl. Count VII. Both motions focus on the same provision of the primary Travelers Policy. The provision is entitled "Broad General Professional Errors and Omissions Exclusion" ("E&O exclusion"), and is attached to the Travelers Policy as an endorsement. It provides that the D&O liability portion of the policy "shall not apply to, and the Company shall have no duty to defend or pay, advance or reimburse Defense Expenses for, any Claim: . . . based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged act, error or omission by any insured with respect to the rendering of, or failure to render professional service for any party." The exclusion will have some application to this case because it will remove from coverage mare-lease claims that allege liability for negligent tax or investment advice, but it does not exclude from coverage the vast majority of mare-lease claims, raising allegations of breach of contract, fraud, and even racketeering.

Under Michigan law, an insurance contract is interpreted like any other contract and "must be enforced in accordance with its terms." *Henderson*, 596 N.W.2d at 193. "A court must not hold an insurance company liable for a risk that it did not assume." *Id.* But if the contract is ambiguous, it should be construed in favor of the insured. *Id.* "The fact that a policy does not define a relevant term does not render the policy ambiguous. Rather, reviewing courts must interpret the terms of the contract in accordance with their commonly used meanings." *Id.* at 194.

Under Michigan law, an " 'insured bears the burden of proving coverage, while the insurer must prove that an exclusion to coverage is applicable.' " *Heniser v. Frankenmuth Mut. Ins.*, 449 Mich. 155 n.6 (1995) (quoting *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 448 Mich. 395, 424–25 (1995)). "Exclusions are to be read with the insuring agreement and independent of other exclusions. Exclusionary clauses are to be strictly construed against the insurer." *Farm Bureau Mut. Ins. Co. v. Blood*, 230 Mich. App. 58, 62 (1998) (citations omitted).

The Travelers Policy does not define the term "professionals services," but similar exclusions for rendering or failing to render professional services are relatively common in D&O liability policies. Consequently, Michigan courts have addressed them with some frequency and generally interpreted them broadly. *See, e.g.*, *Am. Fellowship Mut. Ins. Co. v. Ins. Co. of N. Am.*, 282 N.W.2d 425, 427 (Mich. Ct. App. 1979); *Hilderbrandt ex rel. Estate of Hilderbrandt v. Rumsey & Sons Constr.*, No. 220340, 2001 WL 624966 at *7 (Mich. Ct. App. June 5, 2001). However, they should not be interpreted so broadly that the exclusion "swallows" the entire policy. *See Food Pro Int'l v. Farmers Ins. Exch.*, 169 Cal. App. 4th 976, 986–92 (Cal. Ct. App. 2008); *Psychiatric Assocs. v. St. Paul fire & Marine Ins. Co.*, 647 So. 2d 134, 138–39 (Fla. Dist. Ct. App. 1994). One commonly employed definition provides that a "professional service" is "one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor or skill, and the labor or skill is predominantly mental or intellectual, rather than physical or manual." *Marx v. Hartford Accident & Indem. Co.*, 157 N.W.2d 870, 871–72 (Neb. 1968).

Although Michigan Courts have previously held that E&O exclusions should be interpreted broadly, their primary concern has been with plaintiffs who try to avoid such exclusions by artful pleading. *Cf. Hilderbrandt*, No. 220340, 2001 WL 624966 at *6–7 (discussing the potential limits

of a professional services exclusion in a general liability insurance contract).  Courts require a close connection between the provision of professional services and the underlying claim before they will deny coverage pursuant to a professional E&O exclusion.  Consequently, a claim that alleges an attorney was negligent in his representation of a client is a professional error or omission claim, whether it is pled as a traditional tort claim alleging malpractice or a breach of contract claim based on the representation agreement.  Similarly, a claim against an investment advisor for poor investment advice is a professional services claim, whether it is pled in tort, contract, or pursuant to the securities and exchange act.  *See MDL Capital Mgmt., Inc. v. Fed. Ins. Co.*, 274 Fed. App'x 169, 172–74 (3d Cir. 2008).  However, a claim against a dentist or physician for sexual misconduct is not a professional errors and omissions claim, even if the alleged misconduct occurred during the time the dentist or physician was supposed to be performing such a service.  Sexual misconduct is not an "error or omission" in providing a professional service; it is outright misconduct that occurred during the time and place where the dentist or physician should have been providing a professional service.  *See Roe v. Fed. Ins. Co.*, 587 N.E.2d 214 (Mass. 1992) (professional liability insurance policy does not cover claim by patient against a dentist alleging dentist sexually assaulted patient during office visits); *but see Vigilant Ins. Co. v. Kambly*, 114 Mich. App. 683, 685–86 (1982) (professional liability policy does apply to claim by patient against her psychiatrist for malpractice where doctor allegedly convinced patient that sexual relationship was part of therapy).  Professional E&O exclusions will apply in situations beyond malpractice suits against professionals, but only in situations where the particular claim is closely related to the provision of a professional services.  *See Kambly*, 114 Mich. App. 683.

Other jurisdictions have also addressed the question with some frequency.  The cases cited

by GeoStar encompass a wide range of circumstances, they include an E&O exclusion in a D&O policy purchased by an insurance company, *Fed. Ins. Co. v. Haw. Elec. Indus.*, No. 94-00125 HG, 1997 U.S. Dist. LEXIS 24129 at *27–42 (D. Haw. Dec. 23, 1997) (lawsuits arising from business decisions by board not excluded), an E&O exclusion in a homeowners policy purchased by a pipe welder, *Cincinnati Ins. Co. v. Harding*, No. 2:06-CV-205, 2007 WL 3124654 at *6–7 (W.D. Mich. Oct. 24, 2007) (lawsuit arising from services as welder not excluded), an E&O exclusion in a general commercial liability policy purchased by a counselor, *Finnie v. LeBlanc*, 856 So. 2d 208, 212 (La. Ct. App. 2008) (suit for inappropriate sexual conduct toward patient not excluded), a professional services policy purchased by a law firm, *Am. Nat'l Fire Ins. Co. v. Harold Abrams, P.C.*, No. 99 C 5807, 2002 U.S. Dist. LEXIS 2577 at *21–26 (N.D. Ill. Feb. 19, 2002) (suit for racketeering and fraud not covered even though related to practice of law), a professional services policy purchased by real estate agents, *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073 (Ill. 1993) (alleged fraud and unfair competition by agents not covered), and a professional and general liability policies purchased by a veterinarian, *Rossoff v. Cincinnati Ins. Co.*, 26 F. Supp. 2d 1095, 1099–1100 (C.D. Ill. 1998) (neither covered liability arising from decision to sell unapproved drug in violation of consent decree).

The cases cited by the insurance companies are similarly broad in scope, including a declaratory judgment action brought by an insurance company against its general liability insurer concerning the scope a E&O exclusion in the policy, *Am. Fellowship Mut. Ins. Co. v. Ins. Co. of N. Am.*, 90 Mich. App. 633 (1979) (policy does not cover negligent operation of underwriting business), a professional services exclusion in a general commercial liability policy purchased by an engineering firm, *Hilderbrand ex rel. Estate of Hilderbrandt*, 2001 WL 624966 (policy did not cover

wrongful death claim alleging negligent excavation and shoring of a trench), a dispute between a failed savings and loan company and its general liability insurer concerning the applicability of a professional E&O exclusion, *Aetna Cas. & Sur. Co. v. Dannenfeldt*, 778 F. Supp. 484 (D. Ariz. 1991) (E&O exclusion barred coverage for claims arising out of the alleged fraudulent sale of debentures), a case filed by clients of an accounting firm against the firm and its general liability insurer alleging negligent tax and investment advice, *Ruel v. Fremont Indem.*, 611 So.2d 171 (La. Ct. App. 4th Cir. 1992) (professional E&O exclusion barred coverage), a claim by the beneficiaries of a trust against the trust's general liability insurer for mismanagement of the trust, *Reinhardt v. Certain Underwriters at Lloyd's, London*, No. A06-949, 2007 WL 900731 (Minn. Ct. App. Mar. 27, 2007) (professional E&O exclusion barred coverage), a claim by the clients of a nonprofit advertising and public relations firm alleging misconduct related to its advertising and public relations services, *Planet Earth Found. v. Gulf Underwriters Ins. Co.*, 130 Wash. App. 1040 (2005) (professional E&O exclusion barred coverage), and a dispute between an investment management firm and its insurer about the scope of separate policies providing professional E&O coverage and D&O coverage, *MDL Capital Mgmt.*, 274 Fed. App'x 169 (E&O policy may cover claims for negligent investment advice but D&O policy did not); *see also Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co.*, 967 F. Supp. 1148 (D. Minn. 1997) (professional E&O clause in D&O liability policy limited insurers duty to indemnify directors and officers from claims related to poor investment advice).

Although the case law is not always consistent, some general principles can be discerned from the decisions. First, professional E&O exclusions in general liability policies are often interpreted more broadly than E&O exclusions in D&O policies. While general liability policies,

in the absence of exclusions, provide coverage for everything from slip and fall claims to professional negligence, D&O policies are more narrowly drafted and designed specifically to protect directors and officers from liability arising from negligence or misconduct in managing a business. Consequently, professional E&O exclusions in D&O policies must be interpreted more narrowly to avoid negating the entire coverage scheme through the operation of an overly broad exclusion. Second, in interpreting the scope of both professional E&O exclusions and professional E&O policies, courts are conscious of the particular profession involved. Whether the insured is a physician, lawyer, veterinarian, psychiatrist, counselor, accountant, investment advisor, engineer, or real estate agent, the insured's professional E&O coverage only indemnifies against errors and omissions related to that profession, and professional E&O exclusions in D&O policies are typically only invoked to bar coverage where the D&O policy was sold to a business engaged in a particular profession. Third, the inquiry is extremely fact-intensive and varies from case to case and from claim to claim. As a result, courts interpreting factual scenarios that originally seem quite similar have often reached contrary results.

With those considerations in mind, the professional E&O exclusion in this case removes from coverage claims that allege GeoStar and its directors and officers made errors in rendering or failing to render "professional services." It does not remove from coverage every claim against the company for any error or omission that occurred in the course of its business. Indeed, the D&O portion of the policy was expressly designed to provide coverage for losses resulting from civil lawsuits against the company and its officers and directors alleging negligent of intentional misconduct in the operation of GeoStar's business. Travelers D&O policy II.A.2. Due to the type of coverage provided by the Axis and Great American policies, the E&O exclusion must be read

more narrowly to avoid a construction that negates the entire policy.

This is particularly true where, as here, the covered entities' business interests are so diverse. GeoStar is primarily engaged in the energy business, but through its subsidiaries, it was also engaged in the equine business as a means of raising capital. If the D&O policies do not cover claims related, even indirectly, to any arguably "professional" service provided by GeoStar and its subsidiaries, the coverage is illusory. Indeed, it would not cover any claims arising from errors or omissions in the conduct of its various businesses. If, as the insurance companies contend, selling interests in a horse business is a professional service,[6] so is conducting oil and gas exploration.

The parties have attached seventeen complaints, complete with exhibits totaling more than 1,000 pages, alleging that all of the claims in the seventeen complaints are excluded by the professional errors and omissions clause. Most of the claims, however, are of the type that were designed to be covered by the Axis and Great American D&O policies, notwithstanding the E&O exclusion. For example, a fraud claim against the officers and directors of GeoStar, alleging ClassicStar sold more mare-lease interests than there were horses will be covered. The relationship between the fraud claim and professional tax or investment advice provided by GeoStar and its subsidiaries is too attenuated to be excluded under the E&O provision. It is a claim for misconduct that occurred in the course of GeoStar's business; it is not a claim alleging an error or omission in

---

[6] The fact that Michigan law defines the term "equine professional" as part of a statute limiting liability associated with the "inherent risk[s]" of owning, riding, training, and exhibiting horses is irrelevant to this dispute. Mich. Comp. Laws § 691.1662(e). Pursuant to the statute, a person who works with horses for a living—an equine professional—is not liable for harm resulting to a participant in an equine activity where the cause of the harm was an inherent risk associated with that activity. Mich. Comp. Laws § 691.1663. The statute does not mean that training, caring for, breeding, and teaching people about horses are "professional services" as the term is used in the Travelers Policy.

the provision of professional services. On the other hand, a claim alleging GeoStar and its employees made negligent misrepresentations when providing clients with tax advice or an opinion letter from an attorney is likely a professional errors and omissions claim—it alleges that GeoStar erred in providing the professional services it had contracted to provide.

In sum, the motions for partial summary judgment filed by Axis and Great American will be denied because the insurance companies have not demonstrated that *all* claims associated with the mare-lease program fall under the professional errors and omissions exclusion. *Blood*, 230 Mich. App. at 62 (noting burden of proving exclusion is on insurer, and exclusions are "strictly construed" against insurer). Some of those claims may be barred, but they are certainly not all barred. GeoStar's cross-motions for summary judgment will be granted in part. Although GeoStar does not bear the burden of proof concerning the exclusions, a reasonable trier of fact could conclude that some claims associated with the mare-lease program are excluded from coverage by the errors and omissions clause. The parties may be able to resolve whether the majority of the mare-lease claims are excluded from coverage by the E&O clause. To the extent they cannot, future motions should focus on specific counts of specific complaints and the appropriate standard of review.

For example, in the case captioned *Ginaldi v. ClassicStar, LLC*, and attached as exhibit 3 to Axis's motion for partial summary judgment, the Plaintiffs assert, inter alia, claims for common law fraud, state law securities fraud, and breach of contract that are not professional errors and omissions claims. Plaintiffs also assert, however, claims against GeoStar employees or agents Karren Hendrix and Terry Green for negligent misrepresentations in opinion letters concerning the tax consequences of the mare-lease program. The negligent misrepresentation claim is excluded from coverage by the

-24-

E&O exclusion.

Finally, there is a specific severability provision in the exclusions portion of the underlying Travelers D&O policy. The provision provides that "[n]o conduct of any Insured Person shall be imputed to any other Insured Person to determine the application of any of the Exclusions set forth" in the exclusions section of the D&O policy. Travelers D&O Policy IV. Consequently, even if the conduct of one officer, director, or employee amounts to an error or omission in rendering or failing to render a professional service and is excluded from coverage, the remaining officers and directors are still covered as long as they did not play a role in rendering or failing to render those professional services. The severability provision does not, however, protect GeoStar or other covered entities from liability for the professional errors and omissions of their employees.

## IV

GeoStar filed a motion for expedited declaratory relief [Dkt. # 45] in the Axis case on November 2, 2009, seeking a declaration that Axis has a duty to "advance" litigation defense costs pending resolution of this case. GeoStar concedes that unlike the underlying Travelers Policy, the Axis Policy is not a "duty to defend" policy. However, GeoStar contends that the Axis policy still requires Axis to pay for legal defense costs if the underlying claim is covered by the policy, and that Axis is required to advance defense costs related to the mare-lease matters at least until this Court issues an order rescinding the policy or declaring that the mare-lease matters are not covered. Axis responds that there is a fundamental difference between "duty to defend" policies like the Travelers Policy, and "reimbursement" policies like the Axis Policy. According to Axis, it has no obligation to "advance" legal defense costs pursuant to a "reimbursement" policy under Michigan law unless the terms of the policy specifically require advancement. GeoStar filed its reply [Dkt. # 49] on

-25-

December 4, 2009, emphasizing for the first time a separate provision in the underlying Travelers Policy that appears to expressly require advancement of defense costs. With the Court's permission, Axis filed a response to GeoStar's reply [Dkt. # 56], contending the underlying provision in the Travelers Policy does not apply to the Axis Policy.

The Axis Policy "follows form" to the underlying Travelers Policy. "Except as specifically set forth in the provisions" of the Axis Policy, the policy provides coverage "in conformance with" the terms of the Travelers Policy. Axis Policy I. The Travelers Policy was designed to provide duty to defend coverage or reimbursement coverage. By election, GeoStar selected duty to defend coverage for the Travelers Policy. Travelers Policy Item 5. The Axis Policy specifically changes that determination, and provides reimbursement coverage instead. Axis Policy VI.C. ("The Insured, and not the Insurer, has the duty to defend all Claims under this Policy."). "In contrast to a duty to pay defense costs, the duty to defend customarily includes an insurer's right to choose the attorney and to control the litigation strategy." *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 464 n.11 (S.D.N.Y. 2005) (citing Am. Jur. Ins. § 1396). If the mare-lease matters are covered by the Axis Policy, Axis has a legal duty to pay defense costs associated with those matters, but no duty to defend.

Pusuant to the terms of the Travelers D&O policy, the insurer "shall pay on behalf of the insured persons" and GeoStar "Loss resulting from Claims made during the Policy Period . . . ." Travelers D&O Policy I. " 'Loss' means Defense Expenses incurred by [GeoStar] or by the Insureds in the defense of a Claim . . . ." *Id.* II.D. The definition of "Claim" includes civil lawsuits like the mare-lease matters. *Id.* II.A.2. " 'Defense Expenses' means reasonable and necessary legal fees and expenses incurred in the investigation, defense, settlement and appeal of a Claim . . . ." Travelers

Policy II.D.

GeoStar contends that the duty to pay defense expenses "exists whenever a complaint against the insured alleges claims that *may* be covered under the Insurer's policy." *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d at 464 (internal quotations omitted and emphasis added). Axis admits that it is required to pay defense expenses for covered matters, but contends that the mare-lease matters are not covered and that it has no duty to "advance" defense costs until the coverage determination is final. *Valassis Commc'ns, Inc. v. Aetna Cas. & Sur. Co.*, 97 F.3d 870, 876 (6th Cir. 1996) (citing *Bd. of Trs. of Mich. State Univ. v. Cont'l Cas. Co.*, 730 F. Supp. 1408, 1422, 1414 (W.D. Mich. 1990)).

GeoStar further contends that the duty to pay defense costs as they are incurred is specifically incorporated into the Travelers Policy. As discussed earlier, the Travelers Policy was either a duty to defend policy or a reimbursement policy depending upon GeoStar's election between the two provisions. GeoStar elected duty to defend coverage for the $5 million in coverage provided by Travelers and reimbursement coverage for the $5 million in coverage provided by Axis. The Travelers Policy provides:

> If reimbursement coverage is provided with respect to the Liability Coverage Parts as indicated in ITEM 5 of the Wrap Declarations:
>
> a.    [Travelers] has no duty to defend any Claim. It shall be the duty of the Insureds to defend Claims. [Travelers] shall have the right to associate with the Insureds in the investigation, defense and settlement, including but not limited to the negotiation of a settlement of any Claim that appears reasonably likely to be covered in whole or in part by this Policy and the selection of appropriate defense counsel;
>
> b.    Upon written request, [Travelers] will advance Defense Expenses for which such Liability Coverage Part provides coverage. Such advanced payments by [Travelers] shall be repaid to [Travelers] by the Insureds severally according to their respective interests in the event and to the extent that the

Insureds shall not be entitled to payment of such Loss under the Policy. As a condition of any payment of Defense Expenses or other Loss under this subsection, [Travelers] may require a written undertaking on terms and conditions satisfactory to [Travelers] guaranteeing the repayment of any Defense Expenses or other Loss paid to or on behalf of any Insured if it is finally determined that any such Loss incurred by such Insured is not covered under the Policy.

Travelers Policy III.D.2. Axis contends that the policy provision does not apply because the parties to the Travelers Policy selected duty to defend coverage in Item 5 of he Wrap Declaration, and part III.D.2. was therefore never part of the Travelers Policy.

However, reimbursement coverage is not an optional endorsement to be added to the Travelers Policy, it is the default provision in the event duty to defend coverage is not purchased. *See Bd. of Trs. of Mich. State Univ.*, 730 F. Supp. at 1414 (noting that duty to pay insurance is less expensive than duty to defend coverage because it extricates the insurer from involvement in the underlying action). Item 5 of the Travelers Policy provides two options: duty to defend or reimbursement coverage. It further provides that if neither choice is selected, "the Policy will provide reimbursement coverage for all applicable Liability Coverage Parts."

Moreover, the Axis Policy specifically disclaims any duty to defend as provided by the Travelers Policy. Axis Policy VI.C. The Axis Policy does not specifically disclaim the applicability of the reimbursement provision of the Travelers Policy. Disclaiming duty to defend coverage permitted Axis to charge a lower premium, *Bd. of Trs. of Mich. State Univ.*, 730 F. Supp. at 1414, but also maintain some involvement in the litigation and participate in selection of counsel. Travelers Policy III.D.2. In effect, pursuant to the terms of the policy, Axis has the dual advantage of exercising some control over the litigation, while also avoiding the duty to provide the defense. If Axis wished to disclaim the applicability of section III.D.2., it certainly could have done so, but

-28-

it did not. Consequently, the insurance provided pursuant to the Axis Policy "appl[ies] in conformance with the provisions" of the Travelers Policy. Axis Policy I.

Michigan law also supports GeoStar's assertion that it is entitled to payments of defense costs as they are incurred, despite the dispute over coverage. Axis relies principally on three federal court decisions applying Michigan law to support its assertion that it should not be required to pay defense costs related to the mare-lease litigation until the coverage dispute is resolved. In *Valassis Communications*, the Sixth Circuit held that an insurer providing D&O coverage pursuant to a reimbursement policy similar to the Axis Policy "had no 'duty to defend' Valassis" and its president in a civil action alleging defamation and tortious interference with a contract. 97 F.3d at 876. After affirming the district court's order granting the insurance company's motion to dismiss for failure to state a claim, which was based on a specific exclusion in the policy for defamation actions, the Sixth Circuit discussed Valassis's claim that trial court erred in concluding that Aetna had no duty to defend Valassis and its president. The Aetna policy provided that the company "will pay Defense Expenses on behalf of" the Valassis president, whose name was Brandon, but that "[n]othing in this paragraph is intended, nor shall it be construed, to create any duty to defend . . . ." After noting the absence of a separate duty to defend clause, the court stated:

> Valassis/Brandon fail to recognize the distinction between a "recovery of defense costs" and a "duty to defend." The former includes defense costs as a part of the losses for which the Aetna policy will reimburse, if covered. A commitment by the insurance company to reimburse the defense costs of the insured does not create a duty to defend on the part of the insurance company. *See* [*Bd. of Trs. of Mich. State Univ.*, 730 F.Supp 1408]. This is especially true when the policy specifically declares that " [n]othing in this paragraph is intended, nor shall it be construed, to create any duty to defend on the part of " Aetna. (Emphasis added). Thus, the district court's conclusion that Aetna did not undertake the defense of Valassis/Brandon in the Sullivan lawsuit was not erroneous.

*Valassis Commc'ns Inc.*, 97 F.3d at 876. The court did not hold there is no duty to pay defense costs

as they are incurred pursuant to a reimbursement policy, it simply held that there is no duty to defend pursuant to a reimbursement policy. That proposition is not in dispute here.

Similarly, in *Board of Trustees of Michigan State University*, 730 F.Supp 1408, and *American Casualty Company of Reading, Pa.*, 854 F. Supp. 492 (W.D. Mich. 1994), federal courts in the Western District of Michigan held that there is no duty to advance defense costs if the underlying claims were "specifically and explicitly excluded [from] coverage with unambiguous policy language . . . ." *Upjohn Co. v. Aetna Cas. & Sur. Co.*, 768 F. Supp. 1186, 1196 (W.D. Mich. 1990). In *Rahn*, for example, the D&O policy was a "claims made" policy, requiring that the claims be made during the coverage period for the policy to apply. The underlying claims were made after the policy period had expired, consequently, they were "specifically and explicitly" excluded from coverage and the insurer properly refused to pay defense expenses. *Rahn*, 854 F. Supp. at 503–04. This is not a case where the underlying claims are "specifically and explicitly" excluded from coverage. In fact, the policy "specifically and explicitly" requires Axis to "advance" defense expenses for claims that may be covered.

Finally, Axis has not articulated a persuasive reason to treat a duty to pay defense costs in a substantially different manner from a duty to defend under Michigan law. The duty to defend attaches under Michigan law if the underlying claims "even arguably come within the policy coverage . . . ." *Am. Bumper and Mfg. Co. v. Hartford Fire Ins. Co.*, 452 Mich. 440, 450–51 (1996). While the dispute over coverage of the underlying claims persists, Axis cannot avoid its duty to pay defense costs associated with those claims any more than Travelers could avoid its duty to defend. *See Hurley v. Columbia Cas. Co.*, 976 F. Supp. 268, 275 (1997) (suggesting that the only significant difference between a "duty to defend and the promise to advance defense costs" under Michigan law

is "who will direct the defense"). *But see Travelers Indem. Co. of Ill. v. Ins. Co. of N. Am.*, 886 F.

Supp. 1520, 1529 (S.D. Cal. 1995) (discussing the differences between an insurer's obligation under

a duty to defend policy and an excess insurer's obligation under a reimbursement policy and noting

that "the duty to reimburse is triggered only after liability has been conclusively established").

Section III.D.2. of the Travelers Policy controls and Axis is obligated to "advance" defense

costs pursuant to the plain language of the policy. This conclusion is supported by Michigan case

law and the absence of a specific provision nullifying section III.D.2. in the Travelers policy.

## V

Great American filed a motion requesting that the Court take judicial notice of the Plummers

guilty pleas to criminal charges in U.S. District Court for the District of Oregon [Dkt. # 31].[7]

GeoStar agrees that the Court may take judicial notice of the pleas, but contends that the facts the

Court may take notice of are only those actually admitted when entering the plea [Dkt. # 33]. The

Court will take judicial notice of the pleas, as well as other records from the criminal docket in the

District of Oregon. However, the Court will only take notice of those facts that have been

specifically admitted by the Plummers in sworn testimony, and only to the extent those facts

implicate the Plummers as opposed to third parties.

"A court shall take judicial notice if requested by a party and supplied with the necessary

information." Fed. R. Evid. 201(d). "A judicially noticed fact must be one not subject to reasonable

dispute in that it is . . . capable of accurate and ready determination by resort to sources whose

accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Court records are a typical

---

[7]Axis has made a similar assertion in response to GeoStar's motion to dismiss, but has not
filed a specific motion asking the Court to take judicial notice. To the extent judicial notice of the
guilty pleas is appropriate, it is equally applicable in both cases.

subject of judicial notice under Rule 201(b)(2). *See* 21B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5106.4 (2d ed. 2005 & Supp. 2009). "Federal courts may take judicial notice of proceedings in other courts of record." *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980) (citation omitted). They may also take judicial notice of guilty pleas, and the factual record associated with those pleas. *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239–40 (4th Cir. 1989).

Here, it is undisputed that the Court may take judicial notice of the records of the criminal proceedings against the Plummers in Oregon. The only question is the extent to which the Court may take judicial notice of factual information contained within those records. Great American contends that when the Plummers entered guilty pleas to the charges listed in the information, they conceded that all of the facts alleged in the information were factually correct. Great American cites *United States v. One Dodge Van* for the proposition that a guilty plea "is an admission of all the material facts in the indictment." 426 F. Supp. 43, 46 n.1 (E.D. Mich. 1976). The Plummers respond that pleading guilty is not an admission that all the facts alleged in the information are true; it is only an admission of those facts which are necessary to satisfy all the elements of the crime charged. *See United States v. Skinner*, 25 F.3d 1314, 1316 (6th Cir. 1994). Under *Skinner*, "[a] guilty plea serves as an 'admission of all the elements of a formal criminal charge.' " *Id.* (quoting *McCarthy v. United States*, 394 U.S. 459, 466 (1969)).

The key point is that a guilty plea serves as an admission of the *material* facts charged in the information or admitted by the Defendant during the plea colloquy. Not, as Great American suggests, *all* the facts charged in the information. In this case, the information is a lengthy document alleging numerous facts related to a single charge: a conspiracy to defraud the United States by

impairing and impeding the Internal Revenue Service [Dkt. # 31-3].  *See* 18 U.S.C. § 371.  The only elements necessary for a conviction pursuant to that charge are "(1) existence of an agreement by two or more persons to defraud the United States; (2) the defendant's knowing and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy."  [Dkt. # 34-2 & 3].  Consequently, the material facts alleged in the information are those relating to an agreement between two or more persons to defraud the United States, the defendant's voluntary participation in that agreement, and the commission of a single overt act in furtherance of that conspiracy.

Every fact stated in the information is not necessary to sustain the conviction pursuant to the statute, as a result, every fact contained in the information is not "material" or "capable of accurate and ready determination."  Fed. R. Evid. 201(b)(2).  The Court will take judicial notice of the records of the criminal action, and the facts specifically admitted by the Plummers in their pleas.  However, it is not appropriate to take judicial notice of all the facts alleged by the government in the information.  Moreover, judicial notice of the facts in the guilty pleas only extends to the Plummers.  The extent to which the guilty pleas are evidence of the involvement of other individuals in the mare-lease fraud remains undecided.

Accordingly, it is **ORDERED** the GeoStar's motion to dismiss in case number 09-12608 [Dkt. # 35] is **GRANTED IN PART AND DENIED IN PART**.  Axis shall have until **March 24, 2010** to amend its complaint to comply with the legal standard articulated in this order.  GeoStar shall answer the amended complaint in accordance with Rule 12.

It is further **ORDERED** that GeoStar's motion to expedite declaratory relief in case number 09-12608 [Dkt. #45] is **GRANTED**.  Axis shall advance defense costs for covered matters in

accordance with paragraph III.D.2.b. of the Travelers' policy.

It is further **ORDERED** that Axis's motion for summary judgment on Count III in case number 09-12608 [Dkt. # 50] is **DENIED WITHOUT PREJUDICE**. Axis has not demonstrated, as a matter of law, that all of the mare-lease matters are excluded from coverage pursuant to the professional errors and omissions exclusion.

It is further **ORDERED** that GeoStar's cross-motion for summary judgment on Count III in case number 09-12608 [Dkt. # 64] is **GRANTED IN PART**.

It is further **ORDERED** that GeoStar's motion to dismiss in case number 09-12488 [Dkt. # 21] is **DENIED**. Great American shall have until **March 24, 2010** to amend its complaint, if it chooses, in accordance with the legal standard articulated in this order. GeoStar shall answer the amended complaint in accordance with Rule 12.

It is further **ORDERED** that Great American's motion for order taking judicial notice in case number 09-12488 [Dkt. # 31] is **GRANTED IN PART AND DENIED IN PART**. The Court will take judicial notice of the guilty pleas and the record of the criminal proceedings in Oregon, but only those facts that were specifically acknowledged by the Plummers in their "petition[s] to enter guilty plea[s]."

It is further **ORDERED** that Great American's motion for summary judgment on Count VII of its complaint in case number 09-12488 [Dkt. # 35] is **DENIED WITHOUT PREJUDICE**. Great American has not demonstrated, as a matter of law, that all of the mare-lease matters are excluded from coverage pursuant to the professional errors and omissions exclusion.

It is further **ORDERED** that GeoStar's cross-motion for summary judgment on Count VII

in case number 09-12488 [Dkt. # 41] is **GRANTED IN PART**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 5, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 5, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS